Eugene A. WAHL and Vibra Screw Feeders Inc., Plaintiffs-Appellees,

v.

CARRIER MANUFACTURING CO., Inc., Defendant-Appellant.

No. 15252.

United States Court of Appeals Seventh Circuit.

March 9, 1966.

Rehearing Denied April 7, 1966.

Thomas F. McWilliams, Chicago, Ill., for appellant.

Stanton T. Lawrence, Jr., New York City, Richard C. O'Connor, New Albany, Ind., Charles E. McKenney, New York City, Orbison, Rudy & O'Connor, New

1

Albany, Ind., Pennie, Edmonds, Morton, Taylor & Adams, New York City, for appellees.

Before HASTINGS, Chief Judge, and KNOCH and CASTLE, Circuit Judges.

CASTLE, Circuit Judge.

Carrier Manufacturing Co., Inc., defendant-appellant, prosecutes this appeal from the judgment order of the District Court entered against it in an action brought by Eugene A. Wahl and Vibra Screw Feeders, Inc., plaintiffs-appellees,[1] charging Carrier with infringement of U.S. Patent No. 2,800,252, entitled Powder-Feeding Apparatus. Carrier asserted invalidity of the patent and denied infringement. Following trial of the issues the court made and entered detailed findings of fact and conclusions of law. The court held claims 14, 15 and 17 of the patent valid and infringed by Carrier's device designated as plaintiffs' Exhibit p–11.

The subject matter of the patent in suit is a powder-feeding apparatus capable of discharging powdered and granular materials into a medium or container at a predetermined volumetric rate. The patented structure embraces, among other things, a storage hopper from which the material is fed to a dispensing tube housing an auger rotated at a predetermined and constant speed. The tube and the auger are simultaneously vibrated by suitable means, the vibration being deliberate and controlled, imparting to the material being conveyed in the tube a constant density which enables the spaces between the flights of the screw to act as a continuous succession of measuring chambers metering the material, and causing it to be discharged from the open end of the tube at a predetermined volumetric rate.

The constant volumetric rate results in a constant weight rate, and the record discloses that accuracy of feed by weight, such as pounds per minute or tons per hour, is important in many industrial applications. The controlled vibration of the auger, which supplies the factor of constant density to the materials being measured and dispensed, permits the achievement of such operating accuracy as enables the apparatus to be successfully used for the measured feeding of such hard-to-handle materials as carbon black, including channel black, a light fluffy powder used in the process of manufacturing photograph records; dry filter cel used in commercial filtration processes and previously required to be slurried to obtain accurately measured feeding; and to meter sticky amorphous powders used in the chemical industries. Previous volumetric feeders were incapable of accurately measuring the dispensing of these and other hard-to-handle powdery or granular materials. It is not disputed that the plaintiffs' commercial structure, which embodies the elements of claims 14, 15 and 17, has enjoyed commercial success.

Claim 14 is typical[2] of the three claims found to be valid, and to be infringed by Carrier's accused apparatus. It reads as follows:

Claim 14. Apparatus for dispensing granular material or the like at a predetermined rate, comprising a member having a material-receiving portion and a material-discharge portion, an auger disposed in said member, means for rotating the auger about its axis to advance the material from the said receiving portion to said discharge portion, and separate power means for deliberately and controllably vibrating the auger during its rotation.

1. Wahl and the corporate plaintiff are, respectively, the owner and the exclusive licensee of the patent.

2. Claim 15 differs from Claim 14 principally by adding a hopper with a discharge opening for feeding the material to the material-receiving portion; Claim 17 defines the material receiving and discharging member as a tube having an intake opening at one end and a discharge opening at the other end, with the auger rotating about its axis at a constant speed within the tube.

The main thrust of Carrier's contentions on appeal is that prior art references either establish such anticipation of Claims 14, 15 and 17 of the patent in suit as invalidates them or require a construction of the claim language which calls for "deliberately and controllably vibrating the auger during its rotation" in a manner which precludes a finding of infringement of the claims by Carrier's accused device. Carrier also contends the District Court's factual findings are deprived of the usual finality imposed by Rule 52(a) of the Federal Rules of Civil Procedure (28 U.S.C.A.) because of remarks by the court, following the posttrial arguments, to the effect that the case was not an easy one to decide, and in which the court identified the technical area presenting difficulty and causing it concern.

The plaintiffs urge that substantial evidence supports the court's factual findings, and that the court's frank recognition that the tasks of resolving conflicting expert testimony, marshalling the pertinent facts, and analyzing the prior art, presented difficulty does not serve to detract from but actually emphasizes the applicability of Rule 52(a).

 We agree with plaintiffs that like many patent infringement actions this one turns on ultimate technical facts the determination of which requires resolution of conflicts in the testimony of experts, and that the court's recognition of the difficulties inherent in arriving at findings in this technical area did not remove those findings, when made, from the scope of Rule 52(a).

 Therefore, insofar as the detailed findings of the court, upon which it predicates its conclusions of validity and infringement, concern factual issues such as the use made of prior art, the nature of the improvement made over prior art, and the characteristics and operational functions of the patented structure and the accused apparatus, Rule 52(a) of the Federal Rules of Civil Procedure (28 U.S.C.A.) applies. The court heard the testimony of expert witnesses in connection with these matters and witnessed the demonstration of the physical exhibits, including the operation of the accused apparatus. The scope of our review of such findings is therefore limited to a determination of whether or not they are "clearly erroneous". Armour & Co. v. Wilson & Co., 7 Cir., 274 F.2d 143, 151–157; Minnesota Mining and Mfg. Co. v. Technical Tape Corp., 7 Cir., 309 F.2d 55, 57; Aerosol Research Company v. Scovill Manufacturing Co., 7 Cir., 334 F.2d 751, 753. If they find support in the evidence we are bound thereby and there remains but the question of whether the court applied the correct legal criteria in reaching the ultimate conclusions it did.

 The District Court found, on the basis of the documentary evidence furnished by the patents themselves and the expert testimony relating to their disclosures, that none of the prior art references cited and relied upon by Carrier [3] is more pertinent than those references cited and considered by the Patent Office, and that none of the prior art references anticipates the patented structure. These findings are supported by a number of factors appearing from the evidence. In this connection there is substantial evidence from which the court was warranted in finding that the structure of the patent in suit is distinguishable from all the cited prior art references in that none of the prior machines or the patent claims, specifications, or illustrations pertaining thereto, discloses an arrangement for mounting the screw for vibration as a part of a vibratory system so that it can be deliberately and controllably vibrated in its environment, as called for in the claims (14, 15 and 17)

3. Patents relied upon by Carrier as prior art references include: Doggwyler U.S. Patent No. 878,363; Holly U.S. Patent No. 1,190,168; Burns U.S. Patent No. 1,488,228; Cross U.S. Patent No. 1,791,752; Stark U.S. Patent No. 2,067,583; Snyder U.S. Patent No. 1,813,262; Rogers U.S. Patent No. 2,317,643; and Klueger U.S. Patent No. 2,631,969.

here involved, to bring about the desired object and result of the patented structure, *i. e.,* the reduction of hard-to-handle material to constant bulk density and causing it to flow into a measuring chamber where it is maintained in its state of constant bulk density and discharged at a predetermined gravimetric rate; that none of the references shows or suggests a vibratory system designed to create and foster a controlled and deliberate vibration in a screw conveyer to permit it to be used, in the combination of elements called for in claims 14, 15 and 17, as an accurate metering device for measuring the discharge of powdery and granular materials; that at the most, the references show, in some instances, a rotating conveyer screw which in its environment is susceptible to receiving some undesigned incidental vibration resulting naturally from the normal operation of the device of which it is a part—no deliberate and controlled impartation of vibration to the screw being involved; and that the claims held valid and infringed disclose a new and useful combination of elements providing a new and unexpected result, performing a function that no feeder had been able to perform, and filling a long existing need for an accurate metering device for the feeding of hard-to-handle materials. On the basis of these factors which find substantial evidentiary support in the record the District Court did not err in its conclusions that the structure and disclosures of claims 14, 15 and 17, were not anticipated in prior art and that these claims meet all the tests of patentability. Aerosol Research Company v. Scovill Manufacturing Co., 7 Cir., 334 F.2d 751, 755.

We turn to consideration of the question of infringement. In this connection the court found:

63. Defendant's screw feeder operates in the same manner, using the same operating principle as plaintiffs' patented feeder.

64. Both feeders have their screws mounted for vibration and both feeders vibrate the screw deliberately and controllably by using separate power means independently adjustable from the power means used to rotate the screw.

65. In plaintiffs' feeder the screw is mounted for vibration on the tube and trough member which is in turn mounted on flexible leaf springs. In defendant's feeder the screw is mounted for vibration on brackets which in turn are mounted on a base plate. The base plate has rubber feet so that its vibrator can freely vibrate the base.

66. Defendant's feeder is constructed in two parts both of which are mounted in a fashion designed to permit them to vibrate freely. One part includes the hopper and the tube and trough member and the other part includes the base which has the screw mounted upon it. Both these parts are mounted for vibration and are vibrated by a vibrator mechanically coupled between the two parts.

67. The vibrator of defendant's feeder operates, as do all vibrators, on the law of physics that for every action there is an equal and opposite reaction. Defendant's vibrator pushes one part of the feeder while it is pulling the other part.

68. The amount of vibration imparted to each dynamic part of defendant's feeder is inversely proportional to the weights or masses of the parts. The part of defendant's feeder (p–11) which includes the base weighs between 4 and 5½ times the weight or mass of the part which includes the hopper.

69. The screw of defendant's feeder (p–11) when the feeder is operated empty, as it was during the courtroom demonstration, vibrates approximately twenty-three thousandths of an inch, which movement is within the ranges of vibration of the Wahl invention.

70. The vibration of the screw of defendant's feeder is substantial for the reason that the screw is caused to vibrate by the deliberate and control-

lable vibration of part of the feeder having the screw mounted thereon. The vibration of defendant's screw is not caused by slight incidental vibrations that would be present in any operating machine.

71. In defendant's machine, where the vibrator is mechanically coupled between the hopper and the base, when the hopper is empty, as it was during the courtroom demonstration, its weight is at its minimum and, therefore, the vibration of the base is also at its minimum. This is because there is less mass in the hopper, so the vibrator will not act upon the other part of the system as vigorously. As material is added to defendant's hopper, its weight relative to the base increases and therefore the vibration in the base increases. This is because there is more mass in the hopper part of the arrangement for the vibrator to push against.

72. The invention of the patent in suit requires that the amount of vibration be enough to vibrate the material to achieve a constant bulk density and to completely fill and empty the chambers of the screw. The type of vibration required in the operation of Wahl's feeder is stated in the patent in suit.

'* * * The character of the mechanical or electromagnetic vibrations imparted to the auger and the associated tube 22 are not critical but must be constant, although the vibration amplitude will be higher for very sticky powders than for relatively free-flowing powders.'

73. The vibration of the screw of defendant's machine is great enough to assure a constant bulk density of the material and to assure complete filling and emptying of the screw.

The testimony of expert witnesses, the physical exhibits, and the trial court's comment concerning its own observation of the demonstration of the operation of Carrier's accused device in open court, combine to fully support these findings.

The claims held to be infringed (14, 15 and 17) call for a deliberate and controllable vibration of the auger during its rotation, and in the combination of the elements specified in those claims. This same combination of elements is utilized in both plaintiffs' commercial structure and Carrier's accused structure. From the testimony and the exhibits it appears that, in essence, all Carrier has done is to transpose the auger from the hopper-trough-tube unit or side of the vibratory system used in each of the devices to the vibrating base side of that system. The vibrator means remains coupled between the two sides and continues to exert deliberate and controlled vibration to each side. There is expert testimony that the vibration the auger in the Carrier device receives is not, as contended by Carrier, merely the undesigned natural vibration which is incidental to every operating machine—or the unintended and solely incidental result of the vibration of the hopper-trough-tube unit of the Carrier structure—but is vibration which operates at a controlled frequency and amplitude. And, Carrier's argument that it does not deliberately vibrate the base, the auger mounts and bearings, and the auger of its device because it intends only to vibrate the hopper-trough-tube unit to which the arm of the vibrating means is attached, is unpersuasive. Carrier designed its machine with the vibrator positioned between the hopper-trough-tube portion and the base portion supporting the auger mounts and auger, and it mounted the base on rubber mountings or feet which permit it to freely vibrate and to transmit such vibration to the auger through the auger mounts and bearings. Carrier cannot escape the natural physical result of its action by disclaiming intent to accomplish it.

Carrier makes the additional contention, based on testimony of its expert witness, that if the base of its feeder is bolted down in such manner that it is "tied solidly to the world" the auger does

not vibrate.[4] In this connection Carrier points to testimony that "it's our instructions—our wishes, to have the base of the machine tied solidly to the world * * bolted down to concrete, or a steel building, or anything that is large and solid", and an estimate that in about 50 or 60 percent of the cases it is done. But Carrier manufactures and sells the feeder with the base mounted on rubber footings, as is depicted on its exhibit illustrating the device and evidenced by the machine itself (plaintiffs' Exhibit p–11), which mounting permits the base to freely vibrate, while isolating such vibration from the surface on which it rests. The inference which may be drawn from this fact affords a basis for denying probative value to the testimony referred to and warranting the District Court's finding that "[t]he base plate has rubber feet so that its vibrator can freely vibrate the base". There is evidence that it is this vibration which is controllably transmitted through the auger mounts and bearings to the auger itself. And, it is Carrier's manufacture, use and sale of the structure identified as plaintiffs' Exhibit p–11 that is held to infringe.

We are of the opinion that substantially supported findings of the District Court warrant its conclusion that Carrier's accused structure, plaintiffs' Exhibit p–11, infringes Claims 14, 15 and 17 of Wahl's U.S. Patent No. 2,800,252. Those findings establish that the Carrier feeder includes each and every element of those patent claims and uses the same principle of operation—a deliberate and controllable vibration of the auger during its rotation, in the combination of such claims—to produce the identical results in the same manner as disclosed by the patent in suit. The Carrier feeder is therefore an infringing device. Binks Manufacturing Co. v. Ransburg Electro-Coating Corp., 7 Cir., 281 F.2d 252, 258; Briggs v. M & J Diesel Locomotive Filter Corp., 7 Cir., 342 F.2d 573, 580.

We conclude that the District Court's factual findings are substantially sup-

ported by the record and we are of the opinion that the conclusions drawn therefrom, both as to the validity of the claims and their infringement, represent the application of correct legal criteria.

The judgment order of the District Court is therefore affirmed.

Affirmed.

---

4. The witness testified that in such case "there is substantially no vibration."