**CARBOLINE COMPANY, Plaintiff,**

v.

**MOBIL OIL CORPORATION, Defendant.**

No. 65 C 2080.

United States District Court
N. D. Illinois, E. D.
May 14, 1969.

Sidney Neuman and Robert L. Austin, Pendleton, Neuman, Seibold & Williams, Chicago, Ill., H. L. Kirkpatrick, R. W. Furlong, Fish, Richardson & Neave, Boston, Mass., of counsel, for plaintiff.

Roy E. Hofer, Hume, Clement, Hume & Lee, Chicago, Ill., Jerome G. Lee, John D. Foley, Morgan, Finnegan, Durham & Pine, New York City, of counsel, for defendant.

## DECISION ON THE MERITS

ROBSON, District Judge.

Carboline Company brings this action against Mobil Oil Corporation for alleged infringement of its patent. The plaintiff seeks injunctive relief and an accounting for damages. The defendant counterclaims for a declaratory judgment on the grounds that the plaintiff's patent is invalid and unenforceable and, further, that the defendant has not and is not infringing upon the patent in suit. The jurisdiction of this court is undis-

puted. The defendant has sold its accused products in the Northern District of Illinois, where it maintains a regular and established place of business. Therefore, venue is proper in this judicial district. 28 U.S.C. § 1400. After a trial on the merits, this court is of the opinion that judgment should be rendered for the plaintiff.

On October 2, 1962, United States Letters Patent No. 3,056,684, entitled "Protective Coatings," were issued to Stanley L. Lopata and William R. Keithler upon an application filed on June 4, 1959. The plaintiff is the owner of the entire right, title, and interest in Patent No. 3,056,684 (hereinafter "the Lopata patent"). The Lopata patent relates to a coating which provides corrosion protection for iron and steel. The coating is of the type containing a large proportion of powdered zinc and operates by galvanic action between the powdered zinc and surface of the iron and steel in the presence of atmospheric moisture. The Lopata patent specifically concerns the vehicle [1] in which the zinc dust is suspended.

The controversy between the parties involves the plaintiff's assertion that the defendant has infringed and is infringing upon the Lopata patent by making, using and selling protective coatings which embody the invention set forth in Claim 1 of the patent.[2] Specifically, the plaintiff charges that the defendant's coatings designated as Mobilzinc 7, 13 F 7, and 46 F 70 [3] infringe upon Claim 1 of the Lopata patent. The parties have stipulated that the defendant has sold its Mobilzinc 7 coating within this judicial district since June, 1965.

The defendant, in its counterclaim for a declaratory judgment, asserts that the Lopata patent is invalid and void because the alleged invention was obvious and anticipated by the prior art, particularly by an invention of John R. Saroyan, by an article published in a Belgian chemical journal, and by a published British patent. The defendant further denies any infringement of the Lopata patent on the ground that its accused products are manufactured in accordance with Mobil's own prior Patent No. 2,524,358 (hereinafter "the Robey patent") granted in 1950, which the plaintiff allegedly disavowed during prosecution of its application for the Lopata patent.

### HISTORY AND BACKGROUND OF THE INVENTION

Corrosion resistant coatings containing quantities of powdered zinc in certain liquid vehicles have been known for over one hundred years. Such coatings are generically designated as "zinc rich" coatings. Long before the Lopata patent, two types of vehicles were known and used for such coatings: organic vehicles such as phenolic oil, and inorganic vehicles such as sodium silicate or other alkali metal silicates. Both of these vehicles had serious commercial drawbacks. Zinc rich coatings made

---

1. In paints and coatings, the pigment or active ingredient (i. e., zinc dust) is carried or suspended in another material called a binder or "vehicle." Vehicles are usually liquids that permit the paint or coating to be applied easily by brush or spray gun.

2. Claim 1 of the Lopata patent states that the invention is

"[a] galvanic action coating material consisting essentially of a filler-component capable of promoting galvanic-protection of a surface to which the coating material is applied, said filler-component being uniformly dispersed throughout and suspended in a homogeneous liquid vehicle which will form a film that is capable, when dry, of permitting permeation of a sufficient amount of moisture to establish galvanic-action between the filler-component and the surface to which the coating material is applied, said vehicle consisting of tetraethyl orthosilicate which has been partially hydrolyzed by the addition thereto of a selected quantity of water which quantity is in the range of .25 to .95 equivalent weights with respect to the quantity of tetraethyl orthosilicate, and said filler-component consisting of powdered zinc."

3. The latter two products are stipulated to be the same as Mobilzinc 7.

with organic vehicles prior to 1959 were subject to attack by solvents, and burned and charred when exposed to high temperatures. These disadvantages were well known in the late 1940's, when at least one such coating was sold commercially in this country. Zinc rich coatings made with inorganic vehicles were sold commercially in this country under the trade names "Zincillate" and "Dimetcote" in the early 1950's. These coatings were resistant to solvents and charring, but the Zincillate coating could be hardened only by baking in an oven at a high temperature, and the Dimetcote product could be hardened only by applying a second coat of curing solution over the first coat of Dimetcote.

Large iron and steel structures of the type on which zinc rich corrosion resistant coatings are commonly used are frequently coated in the field or out of doors, and are therefore exposed to varying weather conditions. Coatings such as the inorganic Zincillate, which had to be baked in an oven to harden, could not be applied in the field or to large structures. This disadvantage was generally recognized when Zincillate became commercially available in the late 1940's. Because of the baking problem, this coating was not widely used or accepted.

Zinc rich aqueous sodium silicate coatings, such as Dimetcote No. 2 and No. 3, available about 1950, require that the second coat of curing solution be applied after a minimum of two hours following application of the first coat in order to become impervious to rain. If exposure to rain occurs before the coating has hardened, the coating is washed away and must be reapplied. Damage to such coatings by rain has been a common occurrence in practice and was generally recognized as a problem in the early 1950's. In addition, the second coat

increased the cost of the applied coating, and thorough, expensive preapplication cleaning of the steel by white metal sandblasting was required.

The uncontroverted evidence shows that prior .to the invention claimed in in the Lopata patent, there was a commercial need for a satisfactory inorganic zinc rich coating which would self-cure [4] at an ordinary temperature without application of a separate curing solution. Because zinc provides galvanic protection only in its metallic form, an appropriate vehicle for the coating was needed which, in addition to possessing all the commercially desirable properties described above, would not react with the very reactive zinc metal.

### THE LOPATA INVENTION

Stanley L. Lopata, one of the joint inventors of the patent in suit, founded the plaintiff, Carboline Company, in 1946. From its inception, the plaintiff was involved in the general field of corrosion resistant coatings. Mr. Lopata's work with powdered zinc coatings began in the early 1950's when he became familiar with the Dimetcote product and its shortcomings. In 1956, Mr. Lopata and William R. Keithler, an employee of the plaintiff, discovered the invention leading to the patent in suit. The vehicle they employed was a partially hydrolyzed ethyl silicate, which they prepared with the use of information contained in a Carbide and Carbon brochure.[5] Prior art in the form of this brochure taught merely that partially hydrolyzed ethyl silicate vehicles were useful for chemical and heat-resistant paints and for decorating rough-cast or sand-blasted metal. The article also taught that such paints do not adhere strongly to smooth metallic surfaces or protect metal against corrosion, and that

---

4. "Self-curing" is the ability of a paint or coating to set-up or dry without baking or heating and without the use of a special curing top coat.

5. The plaintiff's ethyl silicate supplier, the Union Carbide Corporation, provided a

brochure with instructions concerning the hydrolization of its product. "Hydrolization" is a chemical term which means a reaction with water in which chemical bonds are broken in both the water molecules and the molecules of the material being hydrolyzed.

such paints were not stable if certain reactive pigments (not including zinc) were mixed with the vehicle. It was also known that zinc metal was reactive and that reaction products of zinc did not provide galvanic protection.

Carbo Zinc 11, manufactured by the plaintiff according to Claim 1 of the Lopata patent, solved the problem of providing a zinc rich corrosion resistant coating which becomes completely inorganic when cured or hardened, and hence is not subject to charring or to attack by most solvents; which is self-curing at ordinary temperatures and requires no oven baking or separate application of curing solution; which is capable of hardening to the point that it is impervious to rain within a time as short as twenty minutes; and which adheres tightly even to smooth steel and to steel which has been cleaned only to a moderate extent.

Filling a long-felt commercial need, the plaintiff's Carbo Zinc 11 achieved commercial success rapidly without extensive advertising.[6] In 1960, Carbo Zinc 11 sales totaled $104,000, or 6.9 per cent of the total sales of the plaintiff's Maintenance Division. By 1965, the product sales had increased 1457 per cent to $1,620,000 or 41.8 per cent of the Division's total sales. Advertising expenditures, on the other hand, which were $13,300 in 1960, increased to a maximum of $21,200 in 1965, an increase of only 59 per cent. During this same period, total advertising expenses of the Division for all products increased 166 per cent, while the portion of the total spent on advertising the Lopata patented product decreased from about 40 per cent to less than 20 per cent. The evidence does not indicate that Carbo Zinc 11 was advertised any more widely or effectively than competing corrosion resistant coating. Carbo Zinc 11 was marked with the Lopata patent number.

A new combination of well-known elements which produces new, useful and unexpected results is patentable. United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Anderson Company v. Sears, Roebuck & Co., 265 F.2d 755 (7th Cir. 1959). This court finds that at the time of the Lopata invention, it was not obvious to one having ordinary skill in the pertinent art to make a corrosion resistant coating containing zinc powder dispersed in an homogeneous liquid vehicle of partially hydrolyzed ethyl silicate. It was not obvious at that time to what extent the zinc would react with the vehicle. Consequently, it was not obvious whether such a coating would adhere satisfactorily to a steel or iron surface, particularly a surface of smooth steel. When all the elements of a patented combination are well known and the problem solved by the patent is long-existing, the delay and failure of others to produce the invention of the patent in suit is cogent evidence that the invention was not obvious. National Dairy Products Corp. v. Borden Co., 394 F.2d 887 (7th Cir. 1968). The commercial success of Carbo Zinc 11, the product of the Lopata patent, is evidence that the invention was unobvious. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). This is especially true in light of the evidence that such success is clearly not due to excess advertising. Goodyear Tire & Rubber Co., Inc. v. Ray-O-Vac Company, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944); Technicon Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630 (N.D.Ill.1966), aff'd 7 Cir., 385 F.2d 391 (1967). On these grounds, this court concludes that the Lopata patent was not obvious within the meaning of 35 U.S.C. § 103.

The plaintiff's uncontroverted evidence shows not only that the Lopata coating achieved substantial commercial success, but that it also is recognized as a standard in the coating industry. The most compelling evidence of this nature was given by the defendant's own employees. The evidence shows that the defendant became aware of the plain-

---

6. The sales and advertising figures that follow are taken from Plaintiff's Exhibit 36.

tiff's Carbo Zinc 11 in 1959, shortly after it came on the market. The defendant made a preliminary analysis of the product in 1960, before the patent issued. The defendant obtained and studied a copy of the Lopata patent in 1962, shortly after it issued. In testifying at his deposition, Edwin Saul, Director of the defendant's Maintenance and Marine Coatings Department, stated that he considered the plaintiff's Carbo Zinc 11 to be a major seller and a standard in the zinc rich coating field.[7] Frederick M. Loeloff, a research chemist for the defendant, also testified that he used Carbo Zinc 11 as the standard of comparison for his testing and experimentation with ethyl silicate zinc rich coatings because " * * * it was really the only commercial available material of this particular type. * * * "[8] Furthermore, the evidence shows that competitive recognition of the Lopata patent has included a license under the patent by a large company on substantial royalty terms, and application for licenses by several other companies.

It is axiomatic that a patent is presumed valid. Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772 (7th Cir. 1961). In the instant case, the presumption of validity is greatly strengthened because the Lopata invention satisfied a long-felt need and achieved quick and substantial commercial success. General Foods Corp. v. Perk Foods Company, 283 F.Supp. 100 (N.D.Ill.1968); Copease Mfg. Co. v. American Photocopy Equipment Co., supra; Welsh Co. v. Chernivsky, 342 F.2d 586 (7th Cir. 1965), cert. den. 382 U.S. 842, 86 S.Ct. 68, 15 L.Ed.2d 83 (1965). The fact that at least one manufacturer has taken a license under the Lopata patent at a substantial royalty rate, and that other manufacturers have applied for licenses also buttresses the presumption of validity. This court therefore concludes that the Lopata patent is presumed valid, and that the defendant has the resulting burden of rebutting the presumption of validity "by clear and convincing evidence." King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875, 879 (7th Cir. 1966); General Foods Corp. v. Perk Foods Co., supra, 283 F.Supp. at 124; Adler Enterprises, Inc. v. Carson, Pirie, Scott & Co., 218 F.Supp. 325 (N.D.Ill.1963).

## SCOPE AND CONTENT OF THE PRIOR ART

### 1. *The Saroyan Defense*

The defendant asserts that the activities of John R. Saroyan, a civilian employee of the United States Navy, constitute a prior invention within the meaning of 35 U.S.C. § 102(g). The defendant contends that Mr. Saroyan placed the invention claimed in the Lopata patent in the public domain before 1959. Prior knowledge, prior use, or prior invention must be established by proof beyond a reasonable doubt to overcome the presumption of validity of an issued patent. Ingersoll Milling Machine Co. v. General Motors Corp., 110 F.Supp. 12 (N.D.Ill.1952), aff'd 207 F.2d 42 (7th Cir. 1953); Kraft Foods Co. v. Walther Dairy Products, 118 F. Supp. 1 (W.D.Wis.1954), aff'd 234 F.2d 279 (7th Cir. 1956), cert. den. 352 U.S. 926, 77 S.Ct. 223, 1 L.Ed.2d 161 (1956). Mr. Saroyan alone testified as to his activities during the 1940's in developing a coating containing zinc powder and hydrolyzed ethyl silicate. Other persons who he testified had knowledge of these activities were not called as witnesses, although their present location was known and they were apparently available to testify. More is required than the uncorroborated, self-serving statements of an alleged prior user or inventor. The legal presumption to be drawn from this failure is that the testimony of these witnesses allegedly familiar with Mr. Saroyan's work would be adverse to the defendant. Pittsburgh-

---

7. Plaintiff's Exhibit 4, Saul Deposition, p. 40.

8. Plaintiff's Exhibit 4, Loeloff Deposition, p. 20, 22.

Erie Saw Corp. v. Southern Saw Service, Inc., 136 F.Supp. 96 (N.D.Ga.1955), mod. 239 F.2d 339 (5th Cir. 1956), cert. den. 353 U.S. 964, 77 S.Ct. 1047, 1 L.Ed.2d 914 (1957); Canaan Products, Inc. v. Edward Don & Company, 273 F.Supp. 492 (N.D.Ill.1966), aff'd 388 F.2d 540 (7th Cir. 1968).

Only two types of documents were produced by the defendant in support of Mr. Saroyan's testimony. The first were in typewritten form from official files; the second were handwritten loose-leaf documents, entirely in Mr. Saroyan's own handwriting which came from his personal files, and which were not open even to personnel of his laboratory without his specific permission. Only one of the documents from the official files mentioned either zinc dust or hydrolyzed ethyl silicate in any way: the copy of the patent application Serial No. 687,546 filed in the name of Mr. Saroyan on August 1, 1946. All of the other documents from the official files make no mention of metal powder or zinc dust, and mention only various forms of ethyl silicate, not *hydrolyzed* ethyl silicate, for possible use as a fire retardant coating or as a coating for gasoline tanks. Mr. Saroyan testified that his patent application was abandoned because the Navy did not choose to prosecute the application. However, the invention described therein was actually owned by him personally, subject only to a free license to the United States government.

Mr. Saroyan testified that he felt that he had produced a satisfactory corrosion resistant coating containing zinc dust and partially hydrolyzed ethyl silicate at the time he filed his patent in 1946. However, he later modified his testimony to the extent that his tests showed only that the coating had "great promise." Even the handwritten and uncorroborated records from his personal files fail to show that he was ever convinced that he had a satisfactory coating. Not only was the Saroyan patent application abandoned in 1947, and the draft report giving his "preliminary observations" left uncompleted, but the status reports produced show, as he admitted, that he had done nothing significant on the project between November, 1946, and November, 1947. Although Mr. Saroyan stated that he frequently tested the coating during the period 1947–1959, *not even a single document of any kind dated subsequent to 1947 was produced to support his statement.* On this record, the court finds that the defendant has failed to sustain its burden of proving that Mr. Saroyan ever completed or reduced to practice the invention of the Lopata patent, and, further, finds that he abandoned the invention and all work with respect to it in 1947. An abandoned patent application is not proof of prior invention. Monarch Marking System Co. v. Dennison Mfg. Co., 92 F.2d 90 (6th Cir. 1937). It is evidence only of conception and does not prove that the conception was ever reduced to practice or that the invention was completed. Application of Schlittler, 234 F.2d 882, 43 CCPA 986 (1956). For these reasons, this court concludes that the evidence fails to show beyond a reasonable doubt that Mr. Saroyan ever made a satisfactory product and consequently, he is not a prior inventor within the meaning of 35 U.S.C. § 102(g). Kraft Foods Co. v. Walther Dairy Products, supra.

None of the compositions assertedly made by Mr. Saroyan, nor any information about them, were available to the public at any time before the filing date of the Lopata patent. During the 1940's there was not free access to the Paint Laboratory where Mr. Saroyan conducted most of his work. A person needed a pass to gain entry into the Mare Island Navy Yard itself, and once in the yard generally, one needed advance permission and an appointment to enter the Paint Laboratory. The Point Reyes test site where some of his work was done was also under guard to keep out unauthorized visitors. Even authorized visitors could not determine the identity of the coating vehicle Mr. Saroyan was working with simply by look-

ing at it or by examining the test panels to which he applied the coatings. The panels themselves carried only a code number and the key to the code was kept in a book in Mr. Saroyan's laboratory. Only small batches of these coatings were assertedly made for test purposes, although full manufacturing facilities were available. Mr. Saroyan testified that some tests were conducted on Navy ships. However, records were not produced to support this assertion. All of the work done by Mr. Saroyan was under the security classification "Restricted" from the time he began work until November, 1953. Even after the security classification was abolished in 1953, Mr. Saroyan did not volunteer information about his work. Nothing was published describing his work until 1963 or later, after the Lopata patent was issued in 1962. Mr. Saroyan's statement during trial that about 190 persons had learned of his work was unsupported by any of the documents produced, and he himself admitted that he could not remember as to how many of these persons he had actually revealed the nature of the composition or of the vehicle. Not one of the alleged 190 was called to testify. The term "known or used" in 35 U.S.C. § 102(a) means knowledge or use available to the public. Minneapolis-Honeywell Reg. Co. v. Midwestern Inst., Inc., 298 F.2d 36 (7th Cir. 1961). The term "public use" in 35 U.S.C. § 102(b) means use open to the public. FMC Corporation v. F. E. Myers & Bro. Co., 384 F.2d 4 (6th Cir. 1967); cert. den. 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968). Work done under the government security classification "Restricted" is not publicly available and is not prior art within the meaning of 35 U.S.C. § 102. Minneapolis-Honeywell Reg. Co. v. Midwestern Inst., Inc., supra. The evidence shows that whatever was conceived or done by John Saroyan was subject to security classification for many years, and this court concludes that the defend-

ant has failed to meet its burden of proving beyond a reasonable doubt that the subject matter was placed in the public domain before the filing date of the Lopata patent. See Ingersoll Milling Machine Co. v. General Motors Corp., supra.

On the foregoing grounds, this court concludes that the work of John Saroyan is not prior art within the meaning of 35 U.S.C. § 102(a) or (b), nor is he a prior inventor within the meaning of 35 U.S.C. § 102(g). Therefore, the Saroyan defense conclusively lacks merit.

2. The Belgian Article

The defendant contends that Claim 1 of the Lopata patent was anticipated by and obvious from a Belgian article entitled "Ethyl Silicate Paints," appearing in the June, 1949, publication of "La Chimie des Peintures" (The Chemistry of Paints).[9] The defendant asserts that the article is prior art under 35 U.S.C. §§ 102(b) and 103. Page one of the stipulated translation from the French contains some general statements as to the hydrolysis of ethyl silicate and some of the chemical equations for the hydrolysis and condensation reactions. Page two states that the tests subsequently described were made with "a polycondensed ethyl silicate called Silester I containing ±40% silica." The material employed thereafter is described only as "Silester 1." In particular, the coatings described at page 7 are said to be made by mixing zinc powder with Silester 1 and with toluene or with white spirit.[10] Both defendant's and plaintiff's experts agreed that "Silester 1" is not a chemical name but a trade name and that the material is not made by hydrolyzing ethyl silicate, but instead by reacting silicon tetrachloride with wet alcohol, i. e., alcohol containing a small proportion of water, a few per cent by weight. The plaintiff's expert, Dr. Eugene Rochow, testified that he had

9. Defendant's Exhibit 2-B.

10. White spirit is the name of a common solvent which reduces viscosity.

actually carried out the reactions of silicon tetrachloride with alcohol and water mixtures and had employed nuclear magnetic resonance absorption analysis to study the way in which these ingredients reacted with each other. His evidence showed that the silicon tetrachloride reacts first very rapidly with the relatively small amount of water present to form chlorosiloxanes; that the silicon tetrachloride does not react with the alcohol to form tetraethyl orthosilicate until after all of the water has been used up; and that *no hydrolysis of the tetraethyl orthosilicate could occur.* Dr. Rochow produced a steel panel [11] which had been coated with a mixture prepared in accordance with the Belgian article approximately fourteen months earlier, and which had not yet cured or hardened, being soft, oily, and readily removed from the plate by a fingernail. This evidence was corroborated by that of Hercules D. Tarlas, an expert on corrosion resistant coatings, who produced photographs showing the extent to which steel panels coated with the Belgian mixture remained wet and tacky. The defendant did not offer any evidence to the contrary. The defendant's expert, Sidney Levinson, did not produce any panels or photographs, but he did run tests which he summarized in his report addressed to the defendant's counsel.[12] He stated only that a film of the Belgian vehicle alone, without zinc, applied to a glass plate remained wet over a week, and that mixtures with zinc dust applied to steel panels remained soft for over a week.

The evidence is convincing that the Belgian article teaches only the mixing of zinc powder or dust with a vehicle called "Silester 1," which the record indicates to be the same as ethyl silicate 40 and *not a partially hydrolyzed ethyl silicate,* and that such a mixture is incapable of self-curing or hardening within any reasonable or practical period of time. The court finds that products, such as Silester 1 and ethyl silicate 40, made by reacting silicon tetrachloride with wet alcohol, are not the same as partially hydrolyzed ethyl silicate. Therefore, it is the conclusion of this court that the Belgian article is not sufficiently identical to Claim 1 of the Lopata patent to constitute either anticipation or prior art under 35 U.S.C. §§ 102 or 103.

### 3. The British Patent

The defendant also cites as prior art the British Patent No. 652,136 filed in September, 1949, and published in April, 1951. The British patent describes a coating made by mixing ethyl silicate, which is specifically stated to be prepared from silicon tetrachloride and ethyl alcohol containing five per cent water by weight, with monoethanolamine, then adding zinc dust and white spirit. Monoethanolamine is an alkaline material, not an acid. The defendant's expert, Dr. Robert L. Burwell, testified that the reaction of silicon tetrachloride with alcohol containing five per cent by weight of water produces partially hydrolyzed ethyl silicate *without explaining or substantiating this conclusion.* He concluded that the material thus produced was 21 per cent hydrolyzed ethyl silicate. This testimony is in conflict with the evidence concerning reactions produced by mixing silicon tetrachloride with alcohol and water discussed above in regard to the Belgian article. However, even if Dr. Burwell's assumptions were correct that this reaction produced *hydrolyzed* ethyl silicate, the calculated extent of hydrolysis is outside the range called for in the Lopata patent, i. e., 25 to 95 per cent. The defendant points to the statement in the British patent that more water may be added, but not beyond the point at which gelling occurs. Dr. Burwell testified that one could add an amount of water that would lead to 39 per cent hydrolysis, without stating that he had ever done so, and concluded that such a product would be the same as ethyl silicate 40. This testi-

---

11. Plaintiff's Exhibit 37.

12. Defendant's Exhibit 39A.

mony is in conflict with the evidence as to the nature of ethyl silicate, as distinguished from partially hydrolyzed ethyl silicate. It is also in conflict with the uncontradicted testimony of Dr. Rochow that alkaline catalysts frequently cause precipitation of white particles during hydrolysis of ethyl silicate, and the statement to the same effect in the defendant's own Robey patent:

> " * * * In the presence of alkaline materials, the reaction proceeds extremely rapidly and gels or gelatinous precipitates are formed." Robey Patent, Col. 1, lines 26–28.

Precisely the same statement appears in the Carbide and Carbon Bulletin at page 4, col. 2. This testimony is also in conflict with the uncontradicted testimony of Mr. Hercules D. Tarlas that the introduction of as little as 0.1 per cent by weight of water into a mixture of ethyl silicate 40 and monoethanolamine causes the formation of a cloudy precipitate, and that the introduction of one per cent causes the material to gel in a short period of time. *Such vehicles are not homogeneous, as required by the Lopata patent.* Disclosures in prior art foreign patents are strictly construed and are restricted to what is clearly and definitely disclosed therein. Nordberg Mfg. Co. v. Woolery Machine Co., 79 F.2d 685, 687 (7th Cir. 1935); Adler Enterprises, Inc. v. Carson, Pirie, Scott & Co., 218 F.Supp. 325, 330 (N.D.Ill.1963). This court is therefore of the opinion that the British patent is not sufficiently identical to Claim 1 of the Lopata patent to constitute either anticipation or prior art under 35 U.S.C. §§ 102 or 103.

#### 4. *Other References*

The brochures published by the Carbide and Carbon Chemicals Corporation in 1945 [13] and 1954 [14] describe procedures for the hydrolysis of the three forms of ethyl silicate, and teach that the hydrolysis products from all three forms are equivalent to each other. The brochures teach that the hydrolysis products are acidic and make no mention of zinc powder. The only mention of corrosion resistant coatings appears at page 10 where it is stated that coatings made with such vehicles "do not, however, adhere strongly to smooth, metallic surfaces, nor does the porous coating protect the metal against corrosion."

The article by A. Pass in the Journal of the Oil and Chemists' Association [15] published in 1952, summarizes the history of the use of zinc dust or powder in corrosion resistant coatings for iron and steel. Mr. Pass points out that the highly reactive nature of zinc dust is a problem. The only mention of ethyl silicate as a vehicle is the following reference to the Belgian article, discussed above:

> "A coating based on polycondensed ethyl silicate medium pigmented with micronised mica and zinc dust has been developed on the Continent, *but we have no details on this.*" [16] (Emphasis supplied.)

Neither of the foregoing references is any more pertinent than those principally relied upon by the defendant. Prior art references may not properly be combined to defeat a meritorious contribution unless the references themselves distinctly indicate the desirability of the specific combination. Imhaeuser v. Buerk, 101 U.S. 647, 25 L.Ed. 945 (1879); Eversharp, Inc. v. Fisher Pen Co., Inc., 204 F.Supp. 649 (N.D.Ill. 1961); Adler Enterprises, Inc. v. Carson, Pirie, Scott & Co., supra.

### THE ROBEY PATENT DEFENSE AND THE INFRINGEMENT OF THE LOPATA PATENT

The defendant contends that its accused products are manufactured in accordance with its own Robey patent which was issued in 1950, nine years be-

---

13. Defendant's Exhibit 5.

14. Defendant's Exhibit 51.

15. Defendant's Exhibit 1.

16. Defendant's Exhibit 1, p. 249.

fore the Lopata patent application was filed. The vehicle of the Robey patent, as taught in Example 1, is a mixture of *completely hydrolyzed* ethyl silicate with partially hydrolyzed ethyl silicate, in contrast with the Lopata patent which calls for a vehicle of *partially hydrolyzed* tetraethyl orthosilicate.

 Tetraethyl orthosilicate is a single chemical compound with a fixed composition when pure. It is the purest form of ethyl silicate commercially available. Its molecule consists of a single central silicon atom connected or bonded chemically to four ethoxy groups. Other grades of ethyl silicate are condensed ethyl silicate and ethyl silicate 40, both of which are mixtures of compounds having condensed structures more complicated than that of tetraethyl orthosilicate, and containing a greater number of silicon atoms per molecule than pure tetraethyl orthosilicate. All three forms of ethyl silicate are regarded by the experts for both parties as simply different commercial grades of the same material. Therefore, this court finds sufficient evidence has been presented to conclude that the partially hydrolyzed ethyl silicate 40 used by the defendant in its accused products is the full functional equivalent of partially hydrolyzed tetraethyl orthosilicate. It functions in the same way and produces the same result. Under the doctrine of equivalents, infringement is not avoided by the use of this particular commercial form of ethyl silicate by the defendant. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

The plaintiff's expert, Dr. Rochow, testified that the extent of actual hydrolysis of any grade of ethyl silicate can be determined in terms of tetraethyl orthosilicate as a standard by means of a well-known analytical procedure involving infra-red spectroscopy. The result is expressed as a percentage of partially hydroylzed tetraethyl orthosilicate, as defined in Claim 1 of the Lopata patent. The plaintiff's product, Carbo Zinc 11, includes a homogenous liquid vehicle made by hydrolyzing condensed ethyl silicate which infra-red spectroscopy analysis indicates is the functional equivalent of tetraethyl orthosilicate partially hydrolyzed by the addition of .87 equivalent weight of water, i. e., 87 per cent hydrolyzed. Analysis indicates that the defendant's product, Mobilzinc 7, is the functional equivalent of tetraethyl orthosilicate partially hydrolyzed by the addition of .89 equivalent weight of water, i. e., 89 per cent hydrolyzed.

The evidence indicates that the defendant utilizes a two-step process in manufacturing Mobilzinc 7; the first step is the mixing of ethyl silicate 40 with water and an acid catalyst to cause some hydrolysis to occur; and the second step is the introduction of additional ethyl silicate 40 approximately 20 minutes after the first mixture is made. However, the Robey patent is a three-step process: the first step calls for the mixing of ethyl silicate with water and acid to cause some hydrolysis to occur; the second step involves the introduction of additional ethyl silicate. The Robey patent then teaches a third step involving the introduction of additional water to form a *completely hydrolyzed solution which is the only solution the patent states can be used advantageously as a paint vehicle.* The partially hydrolyzed solutions, which are the result of the initial two steps, are not described in the Robey patent as having any use at all except for preparing the completely hydrolyzed solution which is to be used as a vehicle. Infrared spectroscopy analysis of the defendant's accused products by the plaintiff's expert did not indicate the presence of a completely hydrolyzed solution, as taught in the Robey patent. The only explanation offered by the defendant's expert witness, Dr. Burwell, for the omission of the third step of the Robey patent in the manufacture of Mobilzinc 7 is his opinion that the additional water does not change the relative proportions of completely hydrolyzed to partially hydrolyzed ethyl silicate, despite the state-

ment in the Robey patent that further hydrolysis does occur. Dr. Burwell admitted that he had no personal knowledge of the defendant's actual manufacturing process and based his testimony solely upon a written description of the process employed by the defendant for making its vehicle. Dr. Burwell was also unable to state any practical differences between the vehicle of the Robey patent, as he conceived it to exist, and the vehicle of the Lopata patent, despite the fact that he had carried out the first step of the procedure of the Robey patent. Although at least one procedure is available to show whether the alleged particles of completely hydrolyzed material exist in the Mobilzinc 7 vehicle, i. e., infra-red spectroscopy, *no evidence was offered by the defendant on this point.* To the contrary, the evidence shows that the accused vehicle is clear and homogenous, which *is not characteristic of* completely hydrolyzed ethyl silicate. This court finds, therefore, that the defendant's commercial process for manufacturing its accused products is substantially different from that of its Robey patent. There is no other accurate or appropriate definition of the vehicle used by the defendant other than partially hydrolyzed ethyl silicate, the vehicle taught in the Lopata patent.

 It was admitted by Mr. Saul, the defendant's technical director, that Mobilzinc 7 has all the properties and functions called for by Claim 1 of the Lopata patent, i. e., it has zinc uniformly dispersed and suspended in a liquid vehicle, the ability to promote galvanic protection of a ferrous surface, and formation of a film which when allowed to dry permits permeation of moisture.[17] The defendant's own advertising and labels emphasize the self-curing characteristic of the coating, which is taught in the Lopata patent, and illustrates the importance of this self-curing characteristic in the same way that the plaintiff does by pointing out that it is re-

sistant to water or rain within twenty minutes after application, and by advertising the fact that one can almost paint in the rain with it.[18] Therefore, this court finds that the defendant's accused products function in the same way taught by the Lopata patent in order to produce the same result. The test of infringement is whether the composition claimed in the patent and the alleged infringing composition perform substantially the same function in substantially the same way and accomplish substantially the same result. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Wahl v. Carrier Mfg. Co., 358 F.2d 1 (7th Cir. 1966). This court concludes, therefore, that the defendant's accused products infringe upon the Lopata patent.

## THE FILE WRAPPER ESTOPPEL DEFENSE

 The defendant asserts that the plaintiff disclaimed the Robey patent during the prosecution of the application for the Lopata patent and is thereby estopped from pursuing this infringement claim. Even if it is assumed that that Lopata patent is limited to exclude the Robey vehicle, this defense is untenable in view of the fact that the defendant does not follow the Robey patent in the manufacture of its accused products. The distinctions drawn between the Lopata and Robey patents were that the "galvanic action" appearing in Claim 1 of the Lopata patent is not disclosed or discussed in the Robey patent, and the Robey patent employs a vehicle in which the alkyl silicate is completely hydrolized, as contrasted with the Lopata patent's teaching that its vehicle contains partially hydrolyzed ethyl silicate. The inventors of the Lopata patent excluded completely hydrolyzed ethyl silicate from their claim, but there is nothing in the record to indicate that they intended to restrict themselves with respect to the specific process by which the partially

17. Plaintiff's Exhibits 4, Saul Deposition, pp. 2, 130.

18. Plaintiff's Exhibits 14 and 15.

hydrolyzed ethyl silicate vehicle of their claimed composition was made. The words "hydrolyzed by the addition" of water, contained in Claim 1 of the Lopata patent, do not require that all the material used in hydrolyzing the vehicle be added in a single step. This court finds that the defendant, by adding water in two steps, infringes upon the Lopata claim if analysis of the end product shows that the vehicle is 25 to 95 per cent hydrolyzed. An examination of the complete File Wrapper, together with the co-inventor Lopata's deposition testimony, fails to support the defendant's urged "disavowal" defense. To the contrary, the evidence shows that the patentees at all times have taken the position that the claim in suit would be infringed by any coating having the requisite "galvanic action" characteristics, and that consists essentially of powdered zinc and *partially* hydrolyzed ethyl silicate, as contrasted with Robey's disclosed *completely* hydrolyzed ethyl silicate. This court concludes that the defendant's accused products meet all the requirements of Claim 1 of the Lopata patent. There is no file wrapper estopped because substantive amendments were not made to the claim in suit during the prosecution in the Patent Office of such a nature as to exclude the defendant's accused products. American Photocopy Equipment Co. v. Rovico, Inc., 257 F.Supp. 192 (N.D.Ill.1966), aff'd, 384 F.2d 813 (7th Cir. 1967), cert. den. 390 U.S. 945, 88 S.Ct. 1030, 19 L.Ed.2d 1133 (1968).

## ORDERS

Plaintiff is directed to revise its findings of fact and conclusions of law to conform with this opinion. As a part of said findings a permanent injunction should be granted against further infringement of plaintiff's patent by defendant, and all under control by it or in privity with it. An accounting should be ordered and a special master named for this purpose. The defendant's counterclaim should be dismissed and the costs herein assessed against the defendant.